UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                                CASE NO.

**CELEBRITY CONTRACTORS, INC.**                                       **12-10281**
                                                                      SECTION A
DEBTOR                                                                CHAPTER 7


**STATE OF LOUISIANA,**                                               ADVERSARY NO.
**OFFICE OF COMMUNITY DEVELOPMENT,**                                  **13-1009**
**DISASTER RECOVERY UNIT,**
**HAZARD MITIGATION GRANT PROGRAM**

PLAINTIFF

VERSUS

**CELEBRITY CONTRACTORS, INC.**

DEFENDANT

## OPINION

## I. BACKGROUND

Hurricane Katrina's landfall resulted in billions of losses from flooding. A large portion of those losses were covered by the Federal Flood Insurance Program. To reduce the risk of damages from future flooding, the federal government appropriated money to assist homeowners with the cost of implementing changes to their homes. Three (3) programs, the Road Home Elevation Incentive Program ("RHEI"), the Increased Cost of Compliance Program ("ICC"), and the Hazard Mitigation Grant Program ("HMGP") were designed with this purpose in mind. Each program is administered by the State of Louisiana ("State"), but by different officials with separate rules and regulations for eligibility and funding.

## II. FACTS

The HMGP funds the elevation of homes located in a flood plain.  HMGP was designed to "close the gap" between the costs of elevation and the funds available from the RHEI or ICC programs.  To be eligible, a homeowner had to first exhaust available funding from the RHEI or ICC programs.  As a result, the HMGP not only tracked the use of funds it distributed, but also verified the use of funds separately awarded by the ICC or RHEI programs.[1]  As conditions to funding, the homeowner's contract with HMGP required an elevation contract between the homeowner and a third party contractor, inspection of the work at various stages, verification of the quality of the work once performed, and proof that all previously received RHEI and ICC grants had been used for flood mitigation.[2]

The elevation contractor was not a party to the application,[3] although the State was in contact with the contractor, supervising the progress of the work, the actual work performed in relation to the contract, and its quality.[4]  For example, in connection with the contract with homeowner Althea English, Celebrity Contractors, Inc. ("Celebrity") estimated that 240 feet of chain wall was required to elevate the home.  The State now claims that its inspectors measured only 166 feet of chain wall. As a result, the State is requiring verification of the amount of work Celebrity claims to have performed or a reduction in the price prior to the release of grant funds.[5]

HMGP was originally set up to fund after the completion of work.  However, the State soon

---

[1]  Trial Transcript ("TT") 37; 38:1-16.

[2]  TT 35:2-7; 156:9-12; 171:22-25; 173:23-25; 174:14-18; 175:7-10; 176:2-6; 178:8-25; 179:16-20; 180:9-15; 185:10-18.

[3]  TT 69:24-25.

[4]  TT 173:25; 174:3, 9-18; 176:2-6; 178:8-25; 179:16-20; 185:10-18.

[5]  *See* Exhibit ("Exh") 2, p. 2, column 12.

discovered that most local contractors lacked sufficient capital to fund construction expenses in advance of payment. The State admitted that few, if any, homes were being elevated due to lack of start up funding.[6] As a result, the State amended its funding procedures to allow for an initial advance payment at the start of a project equal to as much as eighty percent (80%) of the cost of elevation.[7] Unfortunately, advance payments to the homeowner soon generated additional problems when homeowners diverted some or all of the funds for personal use.[8] To ensure the funds were properly utilized and delivered to a contractor, the HMGP again adjusted its procedures by issuing two party checks jointly payable to the homeowner and contractor.[9]

The debtor, Celebrity, entered into numerous elevation contracts with homeowners approved for funding by the HMGP, including Ophelia Brooks, Althea English, Terrell Johnson, Sandra Johnson, Henry Burke, George Glover, Louise O'Quin, Zina Shelby, Joann Girod, George Joseph, and Justina Thomas.[10]

Prepetition, Celebrity performed the terms of its contracts with homeowners Ophelia Brooks

---

[6]  Trial Transcript ("TT") 34:13-19.

[7]  TT 32:21.  *See* Exh. 9.  The State explained that its funding provisions were revised to allow for an eighty percent (80%) upfront payment.  Initially however, the State was providing an upfront payment of fifty percent (50%).  TT 35:19-21.

[8]  TT 30:9-11.

[9]  TT 32:21-22.  *See* Exh. 9.

[10]  *See* Exh. 17, pp. 31-32; Exh. 18, pp. 28-29; Exh. 19, pp. 6-7; Exh. 26.

("Brooks"), Althea English ("English") and Terrell Johnson ("Johnson").[11]   The aggregate amount in remaining funding under these homeowners' grants with HMGP is $54,357.41.[12]   Celebrity did not begin, much less complete, the work required under its contracts with homeowners Sandra Johnson, Henry Burke, George Glover, Louise O'Quin, Zina Shelby, Joann Girod, George Joseph, and Justina Thomas.   Nevertheless, Celebrity received prepetition payments totaling $338,492.75 from HMGP grants associated with these homeowners.[13]   All funds were delivered through two party checks payable to Celebrity and the relevant homeowner.   All checks were endorsed by the homeowner and Celebrity and deposited into Celebrity's account.[14]

## II.  LAW AND ANALYSIS

The State's Complaint seeks liquidation of the amounts it alleges are owed by Celebrity for funds paid on work that was not performed. The State claims $338,492.75 in funds disbursed on contracts between the State and Sandra Johnson, Henry Burke, George Glover, Louise O'Quin, Zina Shelby, Joann Girod, George Joseph, and Justina Thomas.[15]

Wilbur J. Babin, Jr., the trustee of Celebrity's estate ("Trustee"), filed an Objection[16] to the

---

[11]  Pleading 49 (adversary proceeding), Uncontested Material Fact Number 13; *see also* TT 151:16-17; 171:11-16.

[12]  Pleading 49 (adversary proceeding), Uncontested Material Fact Number 13; *see also* TT 93:13-18.

[13]  *See* Exh. 26.

[14]  *See* Exh. 26; *see also* TT 78:18-20.

[15]  Pleading 53 (adversary proceeding).

[16]  Pleading 165 (main case).

4

State's proof of claim[17] and a counterclaim in this proceeding challenging the amounts claimed and asserting the rights of Brooks, English, and Johnson to payment of $54,357.41.[18]

The State stipulated that $54,357.41 in funding remains available under the grants due to Brooks, English, and Johnson.  It denied Celebrity's claim to these funds both on the basis that they were not yet due and by challenging Celebrity's standing.  Alternatively, the State asserted a right to setoff any amounts due under these grants against sums it alleged were owed by Celebrity to it.

Celebrity asserted the right to claim the funds appropriated for Brooks, English, and Johnson by virtue of a stipulation *pour autrui*.[19]  It alleged that the funds owed were not subject to setoff or compensation because the obligations due to it were not mutual or equally demandable with those allegedly owed by it to the State.

### A.  Claims by the State Against Celebrity for Conversion or Unjust Enrichment

Trustee admits Celebrity received $338,492.75 in grants through two party checks payable to itself and various homeowners.  The Trustee also stipulated that Celebrity did not perform any work for these funds and that Celebrity is obligated to the State for an unsecured claim of $338,492.75.

---

[17]  Proof of Claim 7.

[18]  In light of *Stern v. Marshall*, 131 S.Ct.2594, 180 L.Ed.2d 475 (2011), the Court raised for consideration by the parties its constitutional authority to adjudicate the Trustee's counterclaim.  In *Stern*, the Supreme Court held that while federal bankruptcy courts have statutory authority under 28 U.S.C. § 157(b)(2)(C) to render final judgments on state law counterclaims, if the counterclaim does not stem from the bankruptcy itself or is not resolved in the process of ruling on a creditor's proof of claim, a bankruptcy court does not have authority under Article III of the United States Constitution to issue a final judgment.  Both parties have stipulated that *Stern* is inapplicable to the instant matter as the Trustee's counterclaim does stem from the bankruptcy proceeding itself.  *See* pleading 42 (adversary proceeding) in which parties stipulated "that no *Stern v. Marshall* issues exist in this case."  The parties further stipulated that they "have no objection to this Court presiding over the trial in this matter."  Because the State has stipulated to the amounts remaining in the accounts of Brooks, English and Johnson, as well as Celebrity's work, the issues before the Court involve the Trustee's standing and the right of setoff under the Bankruptcy Code.

[19]  A second theory under which it may be entitled to the funds is legal subrogation.

### B. Claims by Celebrity Against the State

### 1. Stipulation *Pour Autrui*

Celebrity claims the State is obligated to fund $54,357.41 to it for work performed in elevating the homes of Brooks, English, and Johnson.  Celebrity avers that as a third-party beneficiary under these contracts, it is entitled to assert the homeowners' rights to available funds. While admitting that $54,357.41 in funds remains to be distributed under the grant awards to Brooks, English, and Johnson, the State disputes that Celebrity is a third-party beneficiary entitled to demand payment from it or that any funds are available for distribution at present.

A stipulation *pour autrui* is a contract for the benefit of a third party.  Once the third party has manifested an intention to accept the benefits of the contract,  the parties to the contract may not dissolve it without the third party's consent.[20]  A stipulation *pour autrui* entitles the third-party beneficiary to demand performance under the contract.[21]  The obligor may raise in defense to a demand for performance, any defenses he has against the stipulating party.[22]  The creation of a stipulation *pour autrui* requires a clear expression to benefit the third party, the third party relationship must form the consideration for the contract, and the benefit must be more than incidental to the contract.[23]

Because the State 1) required the execution of an elevation contract prior to awarding a grant; 2) supervised and approved the work performed by the contractor as a condition to funding;

---

[20] La. C.C. art. 1978 *et. seq.*;  *Joseph v. Hosp. Service District No. 2 of Parish of St. Mary*, 939 So.2d 1206, 1211 (La. 2006).

[21] La.C.C.art. 1981.

[22] La.C.C.art. 1982.

[23] *Lemly v. St. Tammany Parish Hospital District*, 614 F.Supp.2d 727, 731 (E.D. La. July 30, 2008).

3) negotiated adjustments to the contract as to scope, quality, and price directly with the contractor; and 4) issued distributions to both the contractor and homeowner, Celebrity contends that it is a third-party beneficiary under the contract.

The State counters that Celebrity is not a party to the grant program and as such it owes no obligation to Celebrity.  Although it admits to inspecting a contractor's work at various stages of construction and on completion, the State contends that it does so to ensure that the purposes of the grant program are achieved. Similarly, the State argues that its decision to distribute funds jointly to contractors and homeowners is also designed to account for the use of funds as required by the federal grant program.

Homeowners entered into contracts with the State to elevate their homes in exchange for HMGP funds.  Prior to approving the homeowners for grants, the State required the homeowners to enter into contracts with local elevation companies.[24] The contracts between the homeowner and State contemplate that Celebrity will perform the work.  In fact, the State's regulations require that all elevation work be performed by a third-party and specifically deny a homeowner funding for work performed himself.[25]  Thus the homeowner's performance with the State is dependent on Celebrity's performance to the homeowner.  Celebrity's performance is not incidental to the State's contract but critical to both the purpose of the program and the conditions for awarding the grant.

These contracts were submitted to the State as part of its review process.[26] The State also asserted the right to supervise and approve the work performed by the contractor prior to

---

[24]  TT 156:9-12.

[25]  TT 156:9-25; 157:2-4.

[26]  *See* Exh. 17, Exh. 18, Exh. 19.

disbursement of funds. The State exercised this right by inspecting the contractor's work at various stages of construction and on completion. When the work was not of a quality or scope acceptable to the State, it negotiated directly with the contractor on a price adjustment.[27]

The State was keenly aware that Celebrity, and indeed most of the elevation contractors, were dependent on the funds promised under the HGMP to perform their work. Originally, the State required contractors to perform prior to the State's release of grant funds. The State admitted that almost immediately it was evident that local contractors lacked sufficient capital to begin work without initial up-front payments. The State concluded that without interim funding, few, if any, homes would be elevated.[28]

As a result, the State changed its funding procedures to provide start-up funds as high as eighty percent (80%) of the total cost of elevation in an effort to increase the elevation work under the program.[29] Initially, the State distributed grant funds directly to the homeowner. However, the program quickly developed problems when some homeowners diverted the funds to personal use.[30] As a result, the State began issuing two party checks jointly payable to the contractor and homeowner.[31] This practice both acknowledged the importance of the contractor in the process and the need to control the use of grant funding.

It is also worth noting that the amount available under the HGMP never exceeded the cost

---

[27] *See* Exh. 2, column 6 labeled "Total Project Cost Reduction."

[28] TT 34:13-19.

[29] TT 32:21. *See* Exh. 9.

[30] TT 30:9-11; 32:21-22

[31] TT 32:21-22. *See* Exh. 9.

of the elevation contract.[32]   The HGMP grants were designed to satisfy the actual costs of construction and no more.   Because the homeowners were not expected to provide any funding on these jobs, the State knew it was the exclusive source of payment on the elevation contracts.[33]   This fact further supports the connection between the State and Celebrity.

In *A.F. Blair Co., Inc. v. Haydel*, 504 So.2d 1044 (La. App. 1st Cir. 1987), a landowner entered into a contract with a contractor to perform work.   The landowner obtained financing for the construction costs with American Bank and Trust Company ("American").   The contractor was notified by American that it was providing financing for the work. The contractor was found to be a third party beneficiary of the contract between American and the landowner because it relied on the representations of the bank to provide funds for the project.   *Blair* is essentially indistinguishable from this case.   But if a distinction were to be made, it would find that stronger evidence of a third party beneficiary relationship exists in this matter.


The State inserted itself into the contractual relationship between the homeowner and elevation contractor.   Not only did it direct remediation when it found the work to be less than acceptable, but it renegotiated the price to be paid when the work performed was less than anticipated under the contracts.   The English contract is an example of this conduct.

---

[32]   This fact is evidenced by Exh. 2 which reflects the cost of the elevation contract versus the amount of HGMP funds.   For example, Brooks' elevation contract price was $130,000.00.   Exh. 2, p. 1, column 5 labeled "Original Contract Price."   This amount was later reduced by $41,325.16, Exh. 2, p. 1, column 6 labeled "Total Project Cost Reduction," for an actual cost of $88,674.84.   Exh. 2, p. 1, column 7 labeled "Current Value of Work Performed."   The total amount of HGMP funds available to Brooks was $58,674.84.   Exh. 2, p. 1, column 2 labeled "Amount of HMGP Released Funds" and column 11 labeled "HMGP Owes Celebrity."

[33]   As previously explained, the State funded through three (3) separate programs but all were tracked by HMGP, and none contemplated that any anticipated cost would be satisfied by the homeowner.

9

Initially, Celebrity described the work to be done for a set price of $128,490.00 and presented its contract to English who accepted.  English submitted the executed contract in her application to the HMGP.  The State reviewed the contract and calculated its own estimate of the cost with profit to elevate based on the scope of the work described.  It then required Celebrity to reduce the price by $21,598.13 to equal its estimate before it committed to accept English into the grant program.  Celebrity consented, and its contract with English was modified to reflect the reduced price.  English was then accepted into the HMGP.

Now that the work has been completed, the State is insisting on yet another reduction.  This time the State claims that the total chain wall poured at English's home is less than was originally estimated.  As a result, the State now asserts a further reduction in the price.  To enforce its demand, it is refusing to pay the grant funds already committed to English.

The State offered no evidence of its right to renegotiate the terms of the contract between the homeowner and Celebrity.  The elevation contract is between the *homeowner and Celebrity*. Celebrity agreed to elevate English's home *for a set* price.  Prior to beginning the work, the State inserted itself into this relationship and required a price reduction based on its reassessment of a fair price.  Celebrity accepted the State's demands and reduced the price by $21,000.00.  It had little choice if it wanted the job, since the State controlled the funding.

Now that the job is complete, the State is insisting on a further price reduction based on a post-construction assessment of the scope of the work performed.  Significantly, the reduction is not based on the *quality* of Celebrity's work.  Nor is it based on an allegation that additional work will be required to complete the job.  Instead, the State claims that because the job required less work

(*i.e.* less chain wall) than the State originally estimated, the *set price contract* between Celebrity and the homeowner should be reduced!

It is clear that the State is exercising control over Celebrity and its contractual relationship with the homeowner well beyond an agreement to fund. It not only directs what work must be done, but what will be paid for that work even after a valid contract has been signed between the homeowner and contractor. Once this is done and the contractor agrees to its demands, the work is performed. Not satisfied with these concessions, the State again takes matters into its own hands when on completion of the work it insists on further reductions in price based on its reassessment of a 'fair cost.' The State simply goes too far.

Because the State (1) inserted itself into the contractual relationship between the homeowners and Celebrity; (2) renegotiated with Celebrity the contract's terms even after execution and performance; and (3) asserted control over Celebrity through funding, the Court finds that a relationship exists between Celebrity and the State and that Celebrity is a third party beneficiary of the homeowners' contracts with the State.

## 2. Defenses to Payment on Homeowner Contracts

The State is entitled to defend any claim by Celebrity for payment on the Brooks, English, or Johnson contracts by asserting any defense available under the contract terms.[34] The State asserts that several conditions for payment have not been satisfied by the homeowners and, therefore, none of the funding is presently owed.

The HMGP requires that homeowners satisfy various obligations in order to receive funding. The first and most important is the successful elevation of their homes to the satisfaction of the

---

[34] La. C.C. art. 1982; *Brooks v. Shipp*, 481 So.2d 655, 658 (La. App. 1st Cir. 1985).

State.  Celebrity has satisfied this requirement for the Brooks, English, and Johnson files.  However, the State asserts a question on the total cost of work performed on the English file.  A second condition to funding is proof that all prior grants by the RHEI or ICC have been exhausted through flood mitigation.  The State asserts that none of the three (3) homeowners in question have supplied this proof.

The State approved a HMGP grant of $58,674.84 for the elevation of Brooks' home.[35]  The State recognized that Celebrity was hired by Brooks to perform the work at a cost of $130,000.00,[36] an amount that was reduced by $41,325.16,[37] for an actual cost of $88,674.84.[38]  This amount was in excess of the HMGP grant, but the deficiency was covered by $30,000.00 previously delivered to Brooks by the RHEI or ICC.  During the course of construction, the State released $50,000.00 in HMGP funds to Brooks.[39]  However, Brooks has failed to provide proof of how she utilized $6,500.00 of HMGP grant money[40] and $30,000 in RHEI or ICC grants for this project.[41]  As a result, the State is withholding further distributions until an accounting for these funds has been supplied.

---

[35]  *See* Exhibit 2, p. 1, column 2 labeled "Amount of HMGP Released Funds" and column 11 labeled "HMGP Owes Celebrity."

[36]  *See* Exhibit 2, p. 1, column 5 labeled "Original Contract Price."

[37]  *See* Exhibit 2, p. 1, column 6 labeled "Total Project Cost Reduction."

[38]  *See* Exhibit 2, p. 1, column 7 labeled "Current Value of Work Performed."

[39]  *See* Exhibit 2, p. 1, column 2 labeled "Amount of HMGP Released Funds."

[40]  *See* Exhibit 2, p. 1, column 10 labeled "FUNDS NOT VERIFIED Applicant Owes Celebrity HMGP Funds."

[41]  *See* Exhibit 2, p. 1, column 9 labeled "FUNDS NOT VERIFIED Applicant Owes Celebrity RHEI or ICC Funds."

The State approved a HMGP grant of $76,891.87 for the elevation of English's home.[42]  The

State recognized that Celebrity was hired by English to perform the work at a cost of $128,490.00,[43]

an amount that was reduced by $21,598.13,[44] for an actual cost of $106,891.87.[45]  Again, RHEI or

ICC grants in the amount of $30,000.00 were previously delivered to English.  During the course

of construction, the State released $42,700.00 in HMGP funds.[46]  The State alleges that English has

failed to provide proof that the RHEI or ICC funds were actually used to elevate her home and that

the work performed was for the amount contracted.[47]


The State approved a HMGP grant of $58,788.20 for the elevation of Johnson's home.[48]  The

State recognized that Celebrity was hired by Johnson to perform the work at a cost of $130,000.00,[49]

---

[42]  *See* Exhibit 2, p. 2, column 2 labeled "Amount of HMGP Released Funds" and column 11 labeled "HMGP Owes Celebrity."

[43]  *See* Exhibit 2, p. 2, column 5 labeled "Original Contract Price."

[44]  *See* Exhibit 2, p. 2, column 6 labeled "Total Project Cost Reduction."

[45]  *See* Exhibit 2, p. 2, column 7 labeled "Current Value of Work Performed."

[46]  *See* Exhibit 2, p. 2, column 2 labeled "Amount of HMGP Released Funds."

[47]  *See* Exhibit 2, p. 2, column 9 labeled "FUNDS NOT VERIFIED Applicant Owes Celebrity RHEI or ICC Funds."  The State also alleges that "As Built Drawings" were not provided and that there is a discrepancy, in terms of concrete masonry linear feet, between what was provided for under the contract and what was verified upon inspection.  *See* Exhibit 2, p. 2, column 12.

[48]  *See* Exhibit 2, p. 4, column 2 labeled "Amount of HMGP Released Funds" and column 11 labeled "HMGP Owes Celebrity."

[49]  *See* Exhibit 2, p. 4, column 5 labeled "Original Contract Price."

an amount that was reduced by $41,211.80,[50] for an actual cost of $88,788.20.[51]  Again, RHEI or

ICC grants in the amount of $30,000.00 were previously delivered to Johnson to cover costs of

elevation.  During the course of construction, the State released $47,297.50 in HMGP funds.[52]

Johnson has failed to provide proof that funds advanced to date were utilized for flood mitigation.[53]

Thus, until this proof is supplied to the State, the funds due under these contracts are not

payable to the individual homeowners.  Celebrity, as the third-party beneficiary under these

contracts is not entitled to demand further performance until the homeowners' obligations are

satisfied.

### 3.  Legal Subrogation/Standing

The State further challenges Celebrity's right to demand distributions under the grant

program.  Although it is inarticulately asserted, the State's defense can be read as one objecting to

Celebrity's standing.

In addition to rights acquired under a stipulation *pour autrui,* the facts of this case also

support a finding that Celebrity is legally subrogated to the rights of Brooks, English, and Johnson

under their contracts with the State, cementing Celebrity's standing to assert the homeowners'

claims.  Subrogation takes place by operation of law when an obligor bound with or for another pays

---

[50]   *See* Exhibit 2, p. 4, column 6 labeled "Total Project Cost Reduction."

[51]   *See* Exhibit 2, p. 4, column 7 labeled "Current Value of Work Performed."

[52]   *See* Exhibit 2, p. 4, column 2 labeled "Amount of HMGP Released Funds."

[53]   *See* Exhibit 2, p. 4, column 10 labeled "FUNDS NOT VERIFIED Applicant Owes Celebrity HMGP Funds" and column 9 labeled "FUNDS NOT VERIFIED Applicant Owes Celebrity RHEI or ICC Funds."

the debt and has recourse against the other as a result of payment.[54]  Celebrity was bound to perform

the elevation work required by the State's contract with the homeowner.  As such, it was bound with

and for the homeowner in the performance of the work required by the State.  Having performed the

work, it is now legally subrogated to the homeowner's rights against the State under the contract.

In *United States Fidelity & Guaranty Company v. Southern Excavation, Inc.*, 480 So.2d 920

(2nd Cir. 1985), *writ denied*, 481 So.2d 1339 (La. 1986), Southern Excavation, Inc. ("SEI") entered

into a contract with American United Products Corporation ("American") pursuant to which SEI

agreed to pay American a sum of money in exchange for American's agreement to perform

construction work.  Simultaneously, American entered into a contract with United States Fidelity

& Guaranty Company ("USF&G") pursuant to which USF&G agreed to perform the contracted

work if American failed to honor its contract with SEI.

American defaulted on its contract with SEI.  As a result, USF&G performed the work on

behalf of American as required by its surety contract.  After USF&G performed, SEI refused to pay

alleging an offset against damages American owed to it on other unrelated contracts.


The State Court, noting that the relationship between SEI and USF&G was not that of

principal debtor and creditor, nevertheless determined that USF&G was entitled to payment under

the contract because USF&G was subrogated to American's rights against SEI.

Subrogation is the substitution of one person to the rights of another.  Thus, an
obligation which is extinguished with regard to the subrogor is continued to the
benefit of the subrogee, who is authorized to the extent that he has paid to avail

---

[54]  Louisiana Civil Code Article 1829(3) provides:
        Subrogation takes place by operation of law:
        (3) In favor of an obligor who pays a debt he owes with others or for others and
        who has recourse against those others as a result of the payment.

himself of the rights and actions of the original subrogor.

*Id*. at 924 (citations omitted).

The facts at issue in *United States Fidelity & Guaranty Company* are similar to the facts before this Court.  The relationship between the State and Celebrity is not that of principal debtor and creditor.   Celebrity, however, performed the work required of homeowners Brooks, English, and Johnson, pursuant to their contracts with the State.  As such Celebrity is subrogated to the rights that homeowners Ophelia Brooks, Althea English, and Terrell Johnson have against the State.  These rights are subject to the same defenses by the State to payment as exist against Brooks, English, or Johnson under their contracts.

As previously discussed, until Brooks, English, and Johnson account for the funds previously disbursed by the RHEI or ICC programs and satisfy the other remaining conditions for funding, the State is within its rights to withhold further distribution.

### 4.  Setoff/Compensation

Section 553 of the Bankruptcy Code provides that a creditor may setoff a mutual debt owing between itself and the debtor despite the filing of a petition for relief.  Section 553, however, "does not create any setoff right; it merely preserves certain rights of setoff that exist under applicable nonbankruptcy law."[55]  In this case, the right to setoff arises under state law, specifically Louisiana's doctrine of judicial compensation.[56]

---

[55]  Collier on Bankruptcy ¶ 553.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed); *see also Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18-19, 116 S.Ct. 286, 289, 133 L.Ed.2d 258, 262 (1995) ("Although no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy.").

[56]  *See In re MAC-JGC Marketing, Inc.*, 277 Fed. Appx. 355, 2008 WL 1924220, *1 (5th Cir. 2008) (applying Louisiana's compensation law in context of Louisiana bankruptcy proceeding); *In re Delta Entergy Resources, Inc.*, 67 B.R. 8, 10 (Bkrtcy. W.D. La. Apr. 24, 1986) (determining as a threshold matter that right of

### a. Compensation

Under Louisiana law, compensation takes place by operation of law when two (2) persons owe each other sums of money that are liquidated and presently due. In such a case, compensation extinguishes both obligations to the extent of the lesser amount.[57]

Compensation requires that debts be owed between identical parties. In this case, Celebrity is asserting the rights of Brooks, English, and Johnson to payment under the contracts with the State. As previously explained, Celebrity's right to demand payment from the State arises either through subrogation or its status as a third-party beneficiary.

Compensation may not take place to the prejudice of the rights previously acquired by third parties.[58] *United States Fidelity & Guaranty Company v. Southern Excavation, Inc.*, *supra*, illustrates this point perfectly. In *United States Fidelity & Guaranty Company*, USF&G performed for American when it defaulted under its contract with SEI. When USF&G requested payment, SEI claimed a right to reduce the amounts owed to USF&G for losses it had incurred on other unrelated defaulted contracts with American. Citing the Louisiana Civil Code, the Court found that compensation cannot take place to the detriment of a party acquiring another's rights. Nevertheless, the precedential value of the *United States Fidelity & Guaranty Company* case is not exact because the State seeks to assert compensation for claims it holds against the acquiring party, Celebrity,

---

compensation exists under Louisiana law); *Wiley v. Public Investors Life Insurance Company*, 498 F.2d 101, 103 (5th Cir. 1974) (recognizing that Louisiana state law determines property rights of the bankrupt); *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136, 141-42 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

[57] La.C.C.art.1893.

[58] La.C.C.art.1899.

rather than the original party to the contract.

The Civil Code does not appear to prohibit compensation between those that acquire rights from the original party to a contract.  Thus, if A and B contract and C acquires rights in the contract from B, A may assert compensation against C provided C owes A a debt.  In this case, assuming the completion of performance, the State owes Celebrity $54,357.41.  Conversely, Celebrity owes the State $338,492.75.  The parties are identical under Louisiana law, and no other party is prejudiced by the State's demand for compensation.[59]

Compensation also requires that the obligations between the parties be equally liquid and demandable.  Because disbursements on the Brooks, English, and Johnson contracts with the State have outstanding obligations which must be satisfied before payment is due, the debts between the State and Celebrity are not subject to compensation.  However, on completion of these requirements, the debts will be at once equally liquid and demandable and by operation of law subject to compensation.

### b.  Setoff

Having set forth the conditions under which a right to compensation exists, the Court must next examine if it can be asserted under 11 U.S.C. § 553.  While no independent right to setoff is available under the Bankruptcy Code, when the issue of setoff arises in the context of a bankruptcy case, additional requirements come into play.  Specifically, to establish a right of setoff, the

---

[59]  The amounts due to the State by Celebrity are also owed by the various homeowners to the State. Arguably the reduction of debt owed by Celebrity to the State through compensation might prejudice the homeowners if they are solidarily bound with Celebrity for the return of the converted funds.  (A reduction in the amount Celebrity owes to the State by the amount the State owes to Celebrity could leave the homeowners owing the State the full amount setoff.)  However, La.C.C.art. 1898 provides that compensation between the obligee and one solidary obligor extinguishes the obligation of the other solidary obligor to the extent of the compensated amount. The compensated amount is divided between the debts due by Celebrity based on the rules of imputation of payment. La. C.C. arts. 1896, 1868.

following must exist:

> (1) a debt owed by the creditor to the debtor which arose prior to the commencement of the bankruptcy case;
> (2) a claim of a creditor against the debtor which arose prior to the commencement of the bankruptcy case; and
> (3) the debt and the claim must be mutual obligations.[60]

There is no dispute that the State's claim against Celebrity arose prepetition. The parties, however, disagree as to whether Celebrity's claim also arose prepetition.

Anticipating the ability of Celebrity to ultimately satisfy the remaining conditions to funding owed by Brooks, English, or Johnson, the State argues that its obligations to fund occurred prepetition, and therefore, it is entitled to setoff any funds due to Brooks, English, or Johnson against monies owed to it by Celebrity. The Trustee argues that because the debts owed by the State to Brooks, English, and Johnson were not <u>payable or fully performed</u> prepetition they are not pre-petition obligations.

In support of their respective positions both parties cite *U.S. Through Agr. Stabilization and Conservation Service v. Gerth*, 991 F.2d 1428 (8th Cir. 1993). In *Gerth*, 991 F.2d at 1433 (citation omitted), the Court provided:

> For setoff purposes, a debt arises when all transactions necessary for liability occur, regardless of whether the claim was contingent, unliquidated, or unmatured when the petition was filed.

The Trustee argues that because all the transactions giving rise to the State's obligation to pay under the Brooks, English, and Johnson contracts were not satisfied prepetition, the State's obligations to Celebrity did not arise prepetition and cannot be setoff under Section 553. The Trustee confuses the

---

[60] *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1035 (5th Cir. 1987).

19

issue of demandability with the creation of the obligation.

Under the Bankruptcy Code, a claim arises when the debtor has a right to payment whether or not the right has been reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.[61]  As evidenced by the contracts existing between the State and Brooks, English, and Johnson, the obligations of the State to Brooks, English, and Johnson arose when the State accepted them into the HMGP program.  What may be an unliquidated, unmatured, or contingent obligation is no less an obligation under the Bankruptcy Code.  As the *Gerth* Court provided:

> [D]ependency on a postpetition event does not prevent a debt from arising prepetition.  The character of a claim is not transformed from pre-petition to postpetition simply because it is contingent, unliquidated or unmatured when the debtor's petition is filed.  A debt can be absolutely owing prepetition even though that debt would never have come into existence except for postpetition events.

*Gerth*, 991 F.2d at 1433-1434 (citations and quotation omitted).

Both Trustee and the State stipulated that Celebrity's work was completed prepetition.  At best, the State is owed post-construction shop drawings and proof as to the use of prior funding.  Clearly the work giving rise to the State's obligations arose prepetition.  As a result, the funds available under the Brooks, English, and Johnson grants are prepetition obligations.


In order to assert setoff, the State must also establish that the obligations are mutual.  The mutuality requirement is strictly construed.[62]  "Mutuality is satisfied when the off-setting obligations

---

[61]  11 U.S.C. § 101(5)(A).

[62]  Collier on Bankruptcy ¶ 553.03[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed)

are held by the same parties in the same capacity."[63]  Thus, "[t]he threshold requirement of mutuality

is that the relevant claim and debt exist between the 'same parties,' meaning simply enough that,

whereas A and B may offset their mutual obligations, A may not offset an obligation that it owes

to B against a debt that B owes to C."[64]  This threshold requirement has not been met as Celebrity

(Party A) owes a debt ($338,492.75) to the State (Party B) and the State owes a debt ($54,357.41)

to homeowners Brooks, English, and Johnson (Party C).  The relationship at hand represents a

"triangular setoff" which is "not permitted under section 553."[65]  The cases cited by the State in

support of mutuality (pleading 64, pp. 22-23), do not involve a "triangular setoff" but rather involve

facts where Party A owes a debt to Party B and Party B owes a debt to Party A.  In *Braniff*, 814 F.2d

at 1032, Exxon Company, U.S.A., ("Exxon") sought to setoff pre-petition claims owed to it by

Braniff Airways, Inc., ("Braniff") against prepetition debts that Exxon owed to Braniff.  The *Matter

of United Sciences of America, Inc.*, 893 F.2d 720, 723-724 (5th Cir. 1990), and *Matter of Corland

Corp.*, 967 F.2d 1069, 1077 (5th Cir. 1992), also involved two-party situations by virtue of

contractual obligations which created mutuality.

  "Closely related to the 'same parties' requirement is the requirement that the parties owe

each

---

[63]  *Meyer Medical Physicians Group Ltd. v. Health Care Service Corporation*, 385 F.3d 1039, 1041 (7th
Cir. 2004) (quotation omitted).  *See also In re Davidovich*, 901 F.2d 1533, 1537 (10th Cir. 1990) (mutuality
mandates that the debts involved be between the same parties standing in the same capacity); *Matter of Bevill,
Bresler & Schulman Asset Management Corp.*, 896 F.2d 54, 59 (3rd Cir. 1990) (to be mutual, debts must be in the
same right and between the same parties, standing in the same capacity).

[64]  Collier on Bankruptcy ¶ 553.03[3][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

[65]  Collier on Bankruptcy ¶ 553.03[3][b][i] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  *See
Matter of United Sciences of America, Inc.*, 893 F.2d 720, 723 (5th Cir. 1990) (mutuality requirement is designed to
protect against a "triangular set-off"); *Matter of Elcona Homes Corp.*, 863 F.2d 483, 486 (7th Cir. 1988) (same);

other something in the same 'capacity.'"[66]   "Capacity" refers to the parties relationship to each

other.[67]  Thus, for example, mutuality is achieved if Party A in his individual capacity owes a debt

to Party B in Party B's individual capacity, and B likewise owes a debt to Party A.[68]  The "same

capacity" requirement has not been met as the State's debt to Celebrity is owed not in Celebrity's

corporate capacity, the capacity in which Celebrity owes its debt to the State, but rather in its

capacity as a third-party beneficiary or subrogee in relation to the State's debt to homeowners

Brooks, English, and Johnson.

As recognized above, Party A (Celebrity) owes a debt of $338,492.75 to Party B (State) and

Party B (State) owes a debt of $54,357.41 to Party C (homeowners Brooks, English, and Johnson).

Mutuality does not exist under federal law.[69]

## III.  CONCLUSION

The Court finds that Celebrity owes the State $338,492.75, the amount that the State paid

to Celebrity on behalf of homeowners Sandra Johnson, Henry Burke, George Glover, Louise

O'Quin, Zina Shelby, Joann Girod, George Joseph, and Justina Thomas.  The Court finds that,

subject to the completion of all requirements under its contracts with Brooks, English, and Johnson,

the State will owe Celebrity $54,357.41.  The Court finds that there can be no setoff of the

---

[66]  Collier on Bankruptcy ¶ 553.03[3][c] (Alan N. Resnick & Henry J. Sommer eds., 16th ed).

[67]  *Id.*

[68]  *Id.*

[69]  *See eg.,* § 553(a)(3)(C) which prohibits the setoff of claims between a debtor's claim and a party who acquires a claim for the purpose of asserting setoff.

$54,357.41 against the $338,492.75 because the required mutuality does not exist.[70]

A judgment in accord with this Opinion will be separately rendered.

---

[70] Also raised as a basis for not allowing a setoff is the fact that the automatic stay has not been lifted. Pleading 67, p. 12. However, in *Matter of Corland Corp.*, 967 F.2d 1069, 1076 (5th Cir. 1992), the Fifth Circuit stated that an automatic stay does not defeat a party's right of setoff; rather, setoff is merely stayed pending an examination of the debtor's and creditor's rights.